The first case in which I think everyone is here is Barboza v. D'Agata. Could you step forward? Good morning. Stephen Bergstein for the Plaintiff Appellant. The defendant police officers were not entitled to qualified immunity in this First Amendment false arrest case. The district court had two holdings that were correct, one that was incorrect. District court properly held that there was no probable cause to arrest the plaintiff. District court properly held that the law was clearly established. District court improperly held that even though the law was clearly established, the defendant police officers were able to rely on counsel in making the arrest, and that holding was incorrect. The amicus argues that it isn't really a three-part standard, it's a two-part standard, and that the law would not be clearly established if officers could reasonably think that their conduct was lawful. So why don't we start with that question about whether or not the law was clearly established. What cases would you ask us to look to, to find the law clearly established here? People v. Mangano for the New York Court of Appeals, 2003. Judge Seibel said that it was directly on all fours. Let me ask you about that. Mangano did not find the law, the New York statute, unconstitutional on its face, but rather as applied. So help us out with how the application in Mangano is on all fours with this one. The speech in Mangano was similar to Barbosa's, but it was more offensive. The speech in Mangano was threatening. The plaintiff called the Parking Violations Bureau five times with profanity, made reference to the license plates of the people who worked in the Parking Violations Bureau, and the appellate term in that case said there were thinly veiled references to retaliation. That's pretty serious, but that wasn't enough to make out the elements of the statute, and that's worse speech than anything Barbosa did. One of the factors that informed the decision there seemed to be that the number called where the messages were left was set up to receive consumer complaints. Now, I don't think that that has a parallel here, but what am I overlooking? Well, there's something of a parallel because the plaintiff wrote what he wrote on a traffic ticket payment form that was sent to him by the town court. He mailed it back in. It wasn't quite a phone call, but it was a communication with a government office. I'm sorry, I'm not being clear, but that form is not here's how you register your complaints with the town. That form has a singular purpose. It accompanies your payment. So to that extent, is there any significant difference or not? I don't think it's a significant difference between the two. In both cases, the individuals were communicating with a government office using crude language. Mangano, it was worse. There's also a New York Court of Appeals case called Dietz, 75 New York 2nd, where they threatened to beat the crap out of the mother day or night on the street. That's a direct threat. That wasn't enough to, that was not enough to make out the elements. So you have two cases where the facts are worse than anything Barbosa did. Under state court of appeals precedence, under federal precedence, we have the well-known standards about true threats, fighting words. Our cases also suggest that you do look at whether the conduct is objectively reasonable. I mean, there is, I think, some lack of clarity, but sometimes it's discussed as part of whether it's clearly established, whether the conduct is objectively reasonable. And here, in light of all the circumstances, including the fact that the ADA asked him to do this, the judge seemingly approved of it all, why wasn't it objectively reasonable for these police officers to make the arrest? The judge didn't approve the arrest. Well, he was part of the whole thing and seemingly, seemingly approved it. If the police officer is standing there, it certainly looked like the judge was, you're about to be arrested now, I think, something along those lines. Well, judges do that at arraignments, but the judge did not play an active role. The judge testified. He just glanced at it and said, here, you're about to be arrested. It's a two-pronged thing. First of all, this is the judge who referred the matter because he thought it could be threatening. So to the extent that the judge thought it could be threatening and to the extent the DA thought it was threatening, would it have been objectively reasonable for a law enforcement officer to do so, especially in these circumstances where he doesn't decide on his own to seek the arrest? He's told to do so by the ADA. It's not objectively reasonable to rely on the ADA's legal advice because, number one, the law was clearly established. Number two, there was no objective basis to think that the plaintiff had directly threatened anyone in his letter. The police have a duty to apply the law and to know the law, too. And as my brief sets forth, looking at the advice of counsel cases from around the country, there are certain themes guiding these cases. Number one, there's no per se entitlement to qualified immunity based on advice of counsel. No, but the Supreme Court in Messerschmitt v. Millender does say that when, because police officers are not expected to be lawyers, the threshold for reaching that conclusion, that the law was clearly established despite prosecutors or magistrates taking a contrary view, is a high one. And in Messerschmitt, the court said that the fact that none of the officials who reviewed a charging instrument in that case expressed concern about its validity was evidence that the error was not obvious. Why wouldn't the same conclusion apply here? Because the error here is obvious. Based on clearly established law, nothing Barbosa did would come close to a true threat or an imminent possibility of danger. Barbosa mailed out the letter in August. He was told to appear in court in October. That's two months. There's no suggestion of an imminent problem. If they wait two months, they should have been at his house that week if it was truly a threat. Messerschmitt does say that you might consider the views of even a magistrate who signs off on a warrant or the ADA, but that is not a dispositive... And the standard is probable cause. Why would a statement that's both a vulgarity and a profanity directed to people who did not issue the ticket that he's aggrieved about not at least raise a concern about whether this person is threatening the women in that office? I mean, you know, the qualified immunity tolerates mistaken judgment, so I'm not suggesting that we would conclude that op initio, but now the question is could the officers have reasonably believed that it was sufficiently threatening to arrest the person? No, because he didn't direct it toward anyone in particular. It didn't suggest imminent violence. It was sent by mail from Connecticut. They told him to show up in two months. You don't wait two months if you really think there's a true threat or an imminent threat of violence. That's what the district court said. All the language from all the Supreme Court cases and this court that talk about what is a true threat and when you can arrest somebody based on their speech involves speech that's much worse than anything Barbosa said. There was a case decided by this court called Poser where I think he said one day you're going to get yours. He said it to their face. That wasn't enough for an arrest. So, you know, what... But context is everything. I mean, there was no reason to be upset with these particular individuals. I mean, the ticket was issued by the state authorities, not the town. These people processed payment of debt. So there's a certain irrationality about the action that might appropriately be considered. But, again, where is the threat? I mean, he didn't direct it toward any individuals. He directed it toward the town. He writes it in caps. He's angry. This is an expression of obvious frustration. Letters like this get sent to government offices and credit card companies, and you throw it away. You don't arrest somebody for speaking like this. People speak like this all the time, unfortunately. This, you know, I get it. What he wrote was immature. Nobody looking at this would say to themselves, oh, my God, something terrible is going to happen to us. What are we going to do? Let's call the police. And if he did call the police, you'd arrest him right away. The clearly established law, as Judge Seibel held, said this doesn't even come close to the kind of threat that would justify an arrest. May I ask you about Officer Gore? On what basis is he entitled or not entitled to qualified immunity? He processed the arrest. He knew what — Did he read Barbosa's message? Yes, he did. Yes, he did. Was that before or after the arrest? It was certainly after the arrest. Okay, so if it was after the arrest, then on what basis is he not entitled to qualified immunity? He has a duty to ensure that nobody is falsely arrested. You know, you have a duty to intervene. That's what this whole case is about. So your view, then, or your position, is that he had a duty as a matter of qualified immunity to undo the arrest? To say, wait a minute. No, no, no, to undo the arrest. Yes, or to say to Degatta, wait a minute, this is not aggravated harassment. What are we doing here? Let's think about this. There's no rush. We waited two months. You know, does this fall within the statute? And it doesn't. At what point does the claim for false arrest attach? Well, it attaches, I think, when he's in handcuffs. But if Gore intervened minutes later, because the police station is attached to the courthouse. At what point, according to the record, did he read the message? Well, I know he read it for sure after the plaintiff was in handcuffs, but he knew what the plaintiff was accused of when he was in court, and the judge lectured the plaintiff about what he had written. Even though the judge, in your view, was not required to do anything about the insufficiency of the complaint, the assisting arresting officer was? If he knows the law. Why? Why is the arresting officer supposed to do it but the judge not supposed to? Well, that assumes the judge played an active role. The judge testified. The judge arraigned him. It is the judge's obligation on an arrest to be sure that there's probable cause to support it. But he only glanced at it. He only glanced. What you have here is three law enforcement officials, the judge, the DA, and the police, who didn't know the law. But in the officer's affidavits, they accurately recite the law, and they know what the legal standard is for aggravated harassment, and when the First Amendment interferes with an arrest, it's in their affidavits, and they arrested him anyway. But with respect to Officer Gore, I want to focus on this because I do not understand your argument. As I understand it, the evidence is that he hadn't even read the information until after the arraignment. Correct. So on what basis would he have any understanding of some of the issues that you're raising or any reason to even read Mangano or any of the cases or be familiar with the nature of the specific language or message from Mr. Barbosa? Well, he knew the message because he read the form, and he could have said this is not aggravated harassment. What are we doing? This is not going to hold up. It's going to be dismissed, and it was pretty decisively. Why are we arresting this guy? He could have said that. Someone could have looked it up and said this is not aggravated harassment. He didn't do that. Thank you. Good morning. I'm Stephen Gabba, the attorney for the appellees, Detective Stephen DeGatta and Officer Melvin Gore. Before I express my arguments on the point, there are three misapprehensions as to the facts of the case that the appellant has asserted, and I'd just like to clear those up. The first is the idea that this case is just about advice of counsel. This was not a situation where a police officer sought out the district attorney and asked for his opinion as to whether an arrest could go forward or not. This was a case where the district attorney affirmatively directed the officers to make the arrest, a case where the district attorney had authority over the officers to direct that they act, a case where the district attorney represented in asking Detective DeGatta. That will only take you so far. If the district attorney had told them to beat the guy to a bloody pulp, you're not saying they would have been required to follow that directive? Clearly, there are situations. I'm sorry, go ahead. So the argument of your adversary is that the directive was so clearly unsupported by the law that the officer could not rely on it? Yes. In good faith. That is, and of course we disagree with that, and I'll get to it in a moment. My point, though, and I can see the Court apprehends it, is that this isn't just an advice of counsel case. This is a case where the district attorney is exercising his authority, and I think that goes to the question of whether the police officer's actions were objectively reasonable or not. It's not a lesser situation where they just sought. We've rejected the notion that there's a three-part standard. The question is whether there's a constitutional violation, which the district court thought there was, and then whether it was objectively reasonable for the officer to think so. Not whether he knew it was violative, but then he acted objectively reasonably. We have to be able to conclude that an officer would objectively reasonably think that he could make an arrest in these circumstances. That's true, and it's the in these circumstances portion that the district attorney's actions play a role in in this case. As I said, this isn't a case where an officer just asked for an off-the-cuff opinion from counsel. It's a factor, and your adversary says that's outweighed by the obvious insufficiency of these facts. Okay. Well, Your Honor, I'll address that, then I'll come back to my point regarding his misrepresentations in a moment. The obvious nature of the clearly established right is something that we contest. We're dealing with a situation in which there was a criminal statute, 240.30, which was in effect in New York. The statute was not overturned until two years after the events that took place in this case. Now, the only authority that the appellant is citing for saying that it was obvious, that it was clearly established right, that an arrest could not take place in these circumstances, is People v. Mangano, and just generalized principles of law that threatening, or not threatening, harassing or aggravating speech is protected by the First Amendment. In Mangano, it's arguably more threatening than the facts here? Well, it's awfully hard to say exactly what was said in Mangano. I mean, the appellate division in the case characterized the language as being not as threatening, and the Court of Appeals felt that, well, there was curse words, and maybe there was some language- Four or five messages, not just one? Well, I don't think the number is terribly important. I think it's context, and I think it's the subject matter of the statements, and we don't know exactly what was said on those tape recordings. Also, as Judge Raggi points out, there's a huge difference between calling into a complaint line and saying things which may be untoward, and actually going out of your way to deface an official government form to indicate your deep dislike for a municipality by changing its name from Town of Liberty to Town of Tyranny. Tyranny is a word that carries some pretty strong connotations. Surely those are political speech connotations. Well, no, but I'm looking at the context of it overall, Your Honor, the way that the message was presented. This was large, scrawl, handwritten message, deeply underlined, and sent out of the clear blue. Let me just stop you right there. Are you telling me that a reference to tyranny is somehow unprotected by the First Amendment? No, not at all. Or somehow even indicative of a threat? Well, it's indicative of a deep state of emotional distress or dislike for a municipality named Town of Liberty, and I think you have to read that into the way that this message was conveyed. To say that this message wasn't directed toward individuals is just wrong. The people who received it took the words, and you should excuse the language, but town bitches to mean the five female town clerks who had been processing this traffic ticket. They received it and … I don't know who's processing the tickets. I mean the letter comes from Justice Brian Rourke, so I'm not sure how you get there. But it's not his state of mind that's important. It's the state of mind of the people who received it. No, it's fairly subjective. It has to be an – doesn't it have to objectively be viewed as a real threat? Well, the people who were at the town, Judge Rourke for one and the DA for another, received the message, knew the facts regarding this particular town court and how it operated, and did perceive it. I don't disagree with you that the subjective perceptions are relevant to the assessment of whether it is objectively fairly viewed as a threat by the officers, but it is in the end an objective standard. It is in the end an objective standard, but that standard has to be considered in context. But the context here, I mean a true threat has got to be imminent. Do you agree with that? Yes. And the context here is that his address is out of state. Yes. And they received this message in the mail. Yes. And can you describe some other indicia in this context of a true imminent threat to anyone in the Village of Liberty? Well, as I pointed out in my brief, there have been many instances in the past of senseless violence. No, no, no, no, no, no. You're talking about instances in the past. In this case, what about the message from someone who is not only outside of the Village but out of state, who pays, pays the traffic ticket, right? Yes. What about that message is imminently, poses an imminent danger to the people in the Village of Liberty? Well, I wouldn't put too much weight on being out of state. It's a relatively short drive across the Connecticut. All right, but you'll put some weight on that. So, I mean, it could have been in state, out of state. I don't think that's terribly important. You're receiving a message. Also a passage of time on this point. Well, yes, but I mean imminent doesn't have to be within the next hour or two. Imminent could be it's going to happen any day, any time now. And here you have an individual who, by the looks of the message, could very possibly be mentally deranged, who's articulating deep dislike for the Town of Liberty, as I said, with the Town of Tyranny, who's addressing a message to what appears to be these five female clerks saying that he's going to F, F them, F them up, F you, that's it. Now, this isn't just a fellow wearing a jacket or just writing something demurely on a note. This is a message which appears to denote something very bad. If he had just said F you, we wouldn't be here. Exclamation point. You would not be here. We wouldn't be here. I mean, look, is it possible? And why is that? Why is that? Because context matters. If you're going to deface a government note, if you're going to direct it to what appears to be. . . But if he had said Village of Tyranny and F you, exclamation point, you wouldn't be here. Well, I don't know. I don't know. It depends on how it was written. But the tyranny actually matters. The tyranny gives context to the language. The tyranny plus F you, exclamation point, you don't know. Written on a note that way, in that type of handwriting, deeply underlined, yes, it does, Your Honor. I think it makes a difference. I thought the context that mattered to you was the fact that the profanity was linked with the vulgarity toward women. And so to that extent, the profanity, which can imply a desire to harm, is linked to particular individuals. Did I misunderstand your argument? That is the crux of the argument, Your Honor. I'm saying that there are some additional factors here which add to that. Well, let me ask you this. Even if we were to conclude that someone who takes this action in these circumstances certainly should be investigated, that is, maybe the police should have gone out and had a talk with him to see if he did pose a danger, why wasn't it premature to arrest him just on the written statement, especially since it wasn't done that day or that night but two months later? Well, Your Honor, the question is qualified immunity. And the reason why the officers should be given qualified immunity is because the district attorney came in and said, this is, in their opinion, a true threat. And I think a fair argument can be made that that language, that note sent as it was, was a true threat. Now, the courts have ultimately held otherwise. I understand that. But an officer in Degatta's position, standing there as a court officer, being directed by the DA based on opinions from the DA that this, in fact, constitutes a true threat, acted objectively reasonably. 100 percent of the officers in that exact same position would do what Degatta did. Not 99 out of 100, 100 out of 100. Let me just, setting aside for a second some of the State cases, are there any Supreme Court or Second Circuit cases that suggest that his words are truly threatening? Well, we have lower court cases. I cited some in my brief as far as that goes. But not these words per se, no. Not that I have found. May I ask, just as a practical matter, am I correct in understanding that there was a settlement between the assistant district attorney who was sued and the plaintiff? That's right. It was held by the lower court that, because I understand. I just wanted to make sure I understood that that part of the case had settled. And between the village as well on the failure to train. There were monetary settlements in the plaintiff's favor on both those. The only people left standing in this case are the two officers who, with all due respect, had the absolute least to do with what occurred here. All right. Let's hear from Mr. Bergstein. Thank you. Thank you. On the issue of imminent threat, again, look at the cases where the defendants were found not to have violated any statute. And those were affirmative statements of future violence. State versus Dietz. Mangano. Poser. Here, there's not even a hint of any violence toward anybody. It's a vulgar act of frustration. There's nothing imminent. It is no future threat. You can't make an arrest based on this type of content. And it's certainly not fighting words. And I can't think of any other exception that would apply here. There's some interesting... Well, the vulgarity or the profanity can have a range of meanings. Wouldn't you agree from, you know, the way it's used routinely by some people to being a statement of intended harm? So it can run the gamut. That assumes that somebody might think that the plaintiff wrote a coherent message. Well, incoherence sometimes can be significant in suggesting danger. As I said, part of the problem here is there's something irrational about directing the anger toward these particular people as opposed to those who were responsible for issuing the summons or the ticket. And so I'm just concerned about language that can be, at one extreme, viewed as threatening, directed toward a group of people who would not reasonably be the targets of such vitriol. And the officer's reaction after a district attorney tells them, the women felt threatened and go and issue a complaint. Well, the DA didn't speak to the women. The judge spoke to the women. I understand that he didn't, but that's a matter of your settlement with him. I don't understand it to be disputed that he told the officers the women felt threatened. But as Judge Seibel said— Right? Yeah, but as Judge Seibel said, as an objective matter, that's not enough to arrest under this statute. But it's a factor, and I'm putting these facts together now, that you've got conduct that could be threatening at the extreme. You've got victims who felt threatened, and you've got an ADA who says, issue a complaint and arrest them for this charge. But there's a major hole in defendant's argument if we accept that proposition. Why would they wait two months? They should have been on his doorstep in two days. If somebody's that crazy, you think they're really going to do it. The DA forgot about it. That's your problem with the DA. No, but it was such an insubstantial event that the DA forgot to write up the accusatory instrument, and he told Degatta to do it because it slipped his mind. I completely understand your frustration with the DA. All right, we're going to take the case under advisement. Thank you. Thank you very much to both sides.